531 So.2d 239 (1988)
David William HUNTER, Appellant,
v.
STATE of Florida, Appellee.
Kelly I. Conklin, Appellant,
v.
STATE of Florida, Appellee.
Nos. 4-86-0807, 4-86-0808.
District Court of Appeal of Florida, Fourth District.
September 21, 1988.
Clarification Denied October 4, 1988.
*240 Fred Haddad of Sandstrom & Haddad, Fort Lauderdale, for appellants.
Robert A. Butterworth, Atty. Gen., Tallahassee, Lee Rosenthal and Alfonso M. Saldana, Asst. Attys. Gen., West Palm Beach, for appellee.
ANSTEAD, Judge.
Appellants were convicted of trafficking in cocaine and conspiracy after the trial court and a jury rejected their defense of entrapment. They were sentenced to the mandatory minimum term of fifteen years in prison and ordered to pay fines of $250,000.00 each. We hold that appellants are entitled to be discharged under the Florida Supreme Court's holding in State v. Glosson, 462 So.2d 1082 (Fla. 1985), affirming dismissal of criminal charges stemming from a drug transaction instigated by an informant paid by the state to initiate drug transactions and testify for the state in the subsequent prosecutions.

FACTS
The drug transaction charged against the appellants came about as a result of the activities of a convicted drug trafficker and police informant, Ron Diamond, who later was the chief prosecution witness against appellants. Diamond had been convicted of trafficking in cocaine and sentenced to the same term now facing appellants: fifteen years minimum mandatory imprisonment and a $250,000.00 fine. Under section 893.135(3), Florida Statutes (1985), a prosecutor may move the sentencing court to reduce or suspend the sentence of a defendant convicted under the drug trafficking statute if the defendant "provides substantial assistance in the identification, arrest, or conviction of any of his accomplices, accessories, coconspirators, or principals." (Emphasis supplied.) Diamond obtained an agreement with the state for the substantial reduction of his own sentence by entering into a section 893.135(3) agreement with the state. However, Diamond's agreement with the state and the trial court did not involve the prosecution of others involved with him, as authorized by section 893.135(3), but rather, according to the undisputed testimony of Diamond and a deputy sheriff, provided that Diamond *241 must make new cases involving a certain amount of cocaine within a certain time frame in order to receive a reduced sentence. Diamond was actually released from prison immediately after conviction by order of a circuit judge under this arrangement with the state. Diamond testified that it was his understanding he would receive a reduction of his sentence at least down to three years and possibly less. Diamond assisted the police in making several cases, but was still one kilogram short of meeting his required quota as the time originally agreed upon was running out. The circuit judge then authorized a sixty-day extension during which Diamond was given a final opportunity to bring in one more kilo of cocaine in order to secure his reduction of sentence. If he failed in doing so, he would be required to surrender and serve the full term of his sentence. After appellants' arrests, Diamond's fifteen-year minimum mandatory sentence and $250,000.00 fine were vacated and the sentence was reduced to one year in prison and five years probation. Diamond actually served only 4-5 months before he was released from prison and his probation terminated.
At the time of the sixty-day extension Diamond was living in the apartment complex where appellant Kelly Conklin lived with his pregnant girlfriend. Conklin had no prior criminal record, was twenty-one years old, recently graduated from art school and worked for David Hunter's advertising firm. Diamond initiated contacts with Conklin and his girlfriend for the purpose of setting up a drug deal. It is undisputed that Diamond instigated the subsequent drug transaction with Conklin and Hunter that led to the convictions herein. Diamond denied threatening Conklin in any way. According to Diamond, he saw Conklin smoking marijuana and, when asked by Diamond about his ability to obtain large quantities of drugs, Conklin showed no reluctance to participate in a drug transaction. A few weeks after Diamond and Conklin met each other, Diamond set up a meeting at their apartment building with undercover agents posing as drug buyers from Detroit. Diamond told Conklin that the "buyers" were members of the Mafia. They showed Conklin a suitcase full of cash in the amount of $116,000.00. They also showed up several times at Conklin's place of employment. On at least two occasions, Conklin indicated he had a connection. Several meetings were set up, but no drugs materialized. Eventually Conklin confided in his boss, Hunter, about Diamond's efforts to obtain drugs. Hunter agreed to help Conklin set up a deal and contacted a former employee about procuring some cocaine. Approximately two months after Conklin and Diamond became acquainted, Diamond engineered the transaction whereby Conklin and his boss David Hunter attempted to sell one kilogram of cocaine to undercover agents working with Diamond. Hunter was taped during the transaction with the undercover agents telling the agents that he had purchased cocaine from this particular supplier for a year.
According to Conklin, Diamond's attitude was friendly when he first approached Conklin about obtaining drugs. Diamond suggested they could both make some easy money. Conklin repeatedly refused to participate, telling Diamond that he did not know anyone from whom he could obtain drugs. Diamond soon became more persistent and aggressive, telephoning Conklin and coming by his apartment and workplace every day, sometimes twice a day. Diamond was "in constant pursuit" of consummating a drug transaction. He became more "insistent" and "aggravated" with Conklin as time passed, and his attitude became threatening. Conklin's girlfriend testified that Conklin repeatedly refused to participate in any drug transaction and that Diamond physically threatened Conklin. Conklin's father testified that after the arrests, Diamond telephoned him and told him that he "had to go back numerous times" to Kelly before Kelly agreed to participate, and that Diamond knew Kelly was broke and needed money because his girlfriend was pregnant.

GLOSSON
In State v. Glosson the Supreme Court held that an agreement to pay an informant a contingency fee for his cooperation *242 in setting up drug transactions and then aiding the subsequent criminal prosecutions violates a defendant's due process rights regardless of the existence of evidence of that defendant's willingness to participate in the offense. The court rejected the state's claim that such defenses should be restricted to instances of physical or psychological coercion:
We reject the narrow application of the due process defense found in the federal cases. Based upon the due process provision of article I, section 9 of the Florida Constitution, we agree with Hohensee and Isaacson that governmental misconduct which violates the constitutional due process right of a defendant, regardless of that defendant's predisposition, requires the dismissal of criminal charges.
Our examination of this case convinces us that the contingent fee agreement with the informant and vital state witness, Wilson, violated the respondents' due process right under our state constitution. According to the stipulated facts, the state attorney's office knew about Wilson's contingent fee agreement and supervised his criminal investigations. Wilson had to testify and cooperate in criminal prosecutions in order to receive his contingent fee from the connected civil forfeitures, and criminal convictions could not be obtained in this case without his testimony. We can imagine few situations with more potential for abuse of a defendant's due process right. The informant here had an enormous financial incentive not only to make criminal cases, but also to color his testimony or even commit perjury in pursuit of the contingent fee. The due process rights of all citizens require us to forbid criminal prosecutions based upon the testimony of vital state witnesses who have what amounts to a financial stake in criminal convictions.

Id. at 1085 (emphasis added). In Glosson, the informant received a percentage of all civil forfeitures arising out of successful criminal investigations initiated by him. The court found that such an agreement violates a defendant's due process rights due to the "enormous incentive" for the informant "to color his testimony or even commit perjury." Id.
We believe the facts of this case are at least as compelling as those relied upon by the supreme court in Glosson and the agreement with Diamond is closely akin to the conduct condemned by the supreme court in Glosson as an abuse of governmental power. As in Glosson, the informant here had an invaluable stake in making new cases: his own freedom. In our view such freedom constituted much more of an "enormous incentive" to "color his testimony" than the strictly monetary arrangement in Glosson.[1] It is undisputed that the informant originated the criminal plan in his own mind, and instigated the commission of the crime solely to obtain his own freedom and relief from the mandatory $250,000.00 fine. As in Glosson, the informant, acting under judicial, prosecutorial, and law enforcement authorization, was given free reign to instigate and create criminal activity where none before existed.[2] Subsequently he was the key witness for the state in appellants' prosecution. The state concedes, for example, that Diamond's testimony is the only evidence the state presented to rebut the appellant Conklin's defense of entrapment. Diamond actually received his agreed payoff when he was released from a fifteen-year mandatory minimum sentence and quarter-million dollar fine. In essence, a convicted cocaine trafficker was allowed to secure his own *243 freedom by convincing someone else to traffic in cocaine.
An agreement to reduce a defendant-turned-informant's sentence is not per se violative of due process, and is in fact legislatively authorized to assist in the prosecution of codefendants. However, we believe the action of the law enforcement officials here, where the informant was authorized to create new criminal activity in order to secure his freedom, rather than merely assist in apprehending those who had already participated in a crime, crossed the line drawn by Glosson wherein the informant was paid "to manufacture, rather than detect, crime." Id. at 1084. We also do not believe the legislature intended such use of the then prevailing version of the substantial assistance statute:
The statutory language is clear. The court may mitigate the ... sentence only when the ... defendant has rendered substantial assistance in the apprehension of others involved in the very crime for which defendant is charged (his accomplices, accessories, co-conspirators, or principals).
Campbell v. State, 453 So.2d 525, 526 (Fla. 5th DCA 1984) (emphasis added).[3] In this case it appears that Diamond was actually out of jail illegally at the time he induced Conklin to traffic in cocaine, and Diamond's subsequent sentence reduction and release was also illegal, since the only statute that authorized Diamond's release was conditioned upon a defendant's assistance in the prosecution of codefendants, and not in making new cases.
There are other substantial issues raised on appeal which we do not address because of our resolution of the Glosson issue. Because we believe the issues we have decided are both difficult and of importance statewide, we certify the following questions as ones of great public importance:
DOES AN AGREEMENT WHEREBY A CONVICTED DRUG TRAFFICKER WILL RECEIVE A SUBSTANTIALLY REDUCED SENTENCE IN EXCHANGE FOR SETTING UP NEW DRUG DEALS AND TESTIFYING FOR THE STATE VIOLATE THE HOLDING IN STATE v. GLOSSON?

ASSUMING THE EXISTENCE OF A DUE PROCESS VIOLATION UNDER GLOSSON, DOES GLOSSON'S HOLDING EXTEND TO A CODEFENDANT WHO WAS NOT THE DIRECT TARGET OF THE GOVERNMENT'S AGENT?
GUNTHER, J., and OWEN, WILLIAM C., Jr., (Retired), Associate Judge, concur.
NOTES
[1] We have not overlooked the forgiving or deletion of the $250,000.00 debt to the state also provided to the informant. We assume that was a minor consideration compared to the reduced prison term.
[2] There is no evidence in the record that Conklin was ever involved in a prior drug transaction. Whether he would have ever participated in a transaction without the inducement of an informant is subject to speculation. Because we have concluded that this case is controlled by Glosson we do not decide the additional issue raised by appellants that the state failed to sustain its burden of proving they were not entrapped by the police into committing this offense.
[3] The key distinction between this case and State v. McQueen, 501 So.2d 631 (Fla. 5th DCA), rev. denied, 513 So.2d 1062 (Fla. 1987) is that the substantial assistance agreement there specifically provided that the informant would assist in arranging drug deals with persons already known to him and who were already in the drug business and predisposed to buy or sell drugs. 501 So.2d at 633. This, of course, is a major and most significant distinction between McQueen and this case, as the agreement with Diamond had no such limitation  it merely required him to "bring in" a certain quantity of drugs. The identity of the actors was unimportant; the amount of drugs was the key. Inherent in the agreement with Diamond was implied authorization for him to make new cases. That is a critical factor in the case at bar and was not even an issue in McQueen. Nevertheless, to the extent it is in conflict we disagree with McQueen.