560 So.2d 288 (1990)
STATE of Florida, Appellant,
v.
Richard ANDERS and William Hood, Appellees.
No. 89-1183.
District Court of Appeal of Florida, Fourth District.
April 18, 1990.
Robert A. Butterworth, Atty. Gen., Tallahassee, and John Tiedemann, Asst. Atty. Gen., West Palm Beach, for appellant.
Pamela I. Perry of Bierman, Shohat & Loewy, P.A., Miami, for appellee  Richard Anders.
Frank A. Rubino, Coconut Grove, for appellee  William Hood.
ANSTEAD, Judge.
This is an appeal from an order dismissing drug charges against the appellees-defendants on the grounds that the government acted improperly in setting up the drug transaction. We affirm.

LAW
In State v. Glosson, 462 So.2d 1082 (Fla. 1985), the Florida Supreme Court held that the due process provisions of the Florida Constitution limited the state's use of paid informants to set up drug transactions. The drug charges against Glosson and five co-defendants resulted from a "reverse sting" operation set up by an informant who had an agreement with the police *289 whereby he would be paid for setting up drug transactions and testifying in the subsequent criminal proceedings. When Glosson and his colleagues purchased drugs from the informant they were arrested. The trial court dismissed the charges on the ground that the utilization of an informant on a contingency fee basis deprived the defendant of his due process rights. The district court affirmed the dismissal. The supreme court affirmed and approved the district court's decision, noting:
The district court relied on Williamson v. United States, 311 F.2d 441 (5th Cir.1962), in holding the respondents had been denied due process because Wilson's contingent arrangement seemed to manufacture, rather than detect, crime.
462 So.2d at 1084. In Williamson, the court dismissed charges against two alleged moonshiners because government agents paid an informant money to set up the purchase of illicit whiskey from the two:
The uncontradicted and unexplained testimony as to the terms of Moye's employment make it necessary that the judgments of conviction be reversed. It may possibly be that the Government investigators had such certain knowledge that Williamson and Lowrey were engaged in illicit liquor dealings that they were justified in contracting with Moye on a contingent fee basis, $200.00 for Williamson and $100.00 for Lowrey, to produce the legally admissible evidence against each of them. It may be also that the investigators carefully instructed Moye on the rules against entrapment and had it clearly understood that Moye would not induce them to commit a crime, but would simply offer them an opportunity for a sale. None of these facts or circumstances were developed in the evidence, though Moye's deposition had been taken months before the trial.
Without some such justification or explanation, we cannot sanction a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed. Such an arrangement might tend to a "frame up," or to cause an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit. The opportunities for abuse are too obvious to require elaboration.
311 F.2d at 444 (footnote omitted; emphasis supplied).
In Glosson, the Florida Supreme Court noted that since Williamson the federal courts had narrowed the circumstances under which a due process violation could be based. The court rejected this narrow application:
We reject the narrow application of the due process defense found in the federal cases. Based upon the due process provision of article 1, section 9 of the Florida Constitution, we agree with [State v.] Hohensee [650 S.W.2d 268 (Mo. 1982)] and Isaacson that governmental misconduct which violates the constitutional due process right of a defendant, regardless of that defendant's predisposition, requires the dismissal of criminal charges.
462 So.2d at 1085. The court held that prosecutions based upon such contingent arrangements should be dismissed regardless of the evidence of predisposition on the part of the defendants.[1] The New York *290 appellate decision, cited with approval in Glosson, threw out charges against a defendant who was lured into selling drugs by an informant who was himself under prosecution, and who set up the deal in exchange for favorable treatment by the state. People v. Isaacson, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978).
This court followed the holding of Glosson in Hunter v. State, 531 So.2d 239 (Fla. 4th DCA 1988). The contingent fee arrangement with the informant in Hunter involved the promise of release from a minimum mandatory prison term and fine rather than the direct payment of money. Cf. Isaacson, 378 N.E.2d 78. The convicted drug dealer-informant in Hunter set up drug transactions in order to avoid a 15 year minimum mandatory sentence and $250,000.00 fine. This court noted that like in Glosson, the informant had an invaluable stake in making new cases, and that:
As in Glosson, the informant acting under judicial, prosecution and law enforcement authorization, was given free reign to instigate and create criminal activity where none before existed. Subsequently he was the key witness for the state in appellants' prosecution... ."
Id. at 242 (footnote omitted).[2]
Based on the holding in Glosson that such government conduct barred prosecutions regardless of the defendant's prior disposition to commit the crime, this court held that both the informant's direct target and a codefendant, brought into the deal by the target, were entitled to discharge.[3]

*291 THIS CASE
The facts of this case are a mix of the facts involved in Glosson and Hunter. Anders and Hood were charged with purchasing drugs from Jorge Livermore, a convicted drug trafficker turned government informant. To avoid a minimum mandatory prison term, Livermore agreed to provide the state with "substantial assistance" by setting up other drug transactions. He acknowledged that he felt "appropriate pressure" to avoid going to prison. He was given a performance deadline, but was otherwise left unrestricted and unguided in how he was to set up transactions and who his targets might be. He testified that he "simply went out in the community and went fishing". Livermore approached Walsh, a stockbroker whom he used to work with, and whom he had twice previously seen give small amounts of cocaine to persons at the brokerage firm. When asked whether he was aware of whether Walsh dealt drugs, the informant said "No. Just those small quantities I was telling you about."
As noted above, Livermore was left completely free not only as to whom he approached but also as to the nature of the transaction to be set up. To entice Walsh, Livermore made up a story about a friend that he used to work with at Eastern Airlines who had come across a suitcase that had a bag with twenty kilos of cocaine in it. Livermore arbitrarily decided on the quantity of the cocaine because he thought that "it would look pretty substantial." He also decided to make the deal a "reverse sting" because he felt "it would be easier to set up the case that way". After listening to Livermore's proposal, Walsh told Livermore that he was going to make some calls and would get back to him.
Livermore testified that he was subsequently contacted by Anders, presumably at the suggestion of Walsh. Anders used to work at the same stockbrokerage firm. Livermore testified that Anders had smoked a couple of "joints" with him in the past and that on one occasion, he bought a small "baggie" of marijuana from Anders, but he was not otherwise aware of whether Anders had ever dealt in drugs. Livermore told Anders he could make a substantial profit from the purchase and subsequent sale of the suitcase drugs. When asked if Anders said what his plans were for use of the profit, the informant replied: "No. I knew that he had just bought a pretty lavish house down in the Keys... ." Anders said that he knew someone from West Palm Beach who would be willing to participate and that he (Anders) would like to make $40,000.00.
Livermore spoke with Anders three or four times by telephone. On the day the deal was scheduled, Livermore met with Anders and appellee Hood, the latter brought into the deal by Anders. Livermore told them that they were late meeting him and "my guys had to go to work". The deal was postponed, but took place the following day, when Anders and Hood appeared with the money and were arrested by the Broward County police.[4] For his efforts, Livermore was released on probation, having served no prison time, and adjudication was withheld on his drug trafficking charges.
The trial court gave the following reasons for dismissing the charges:
Here, Livermore was allowed to create a trafficking offense and offender where none previously existed, to engage in negotiations the contents of which no independent witness can verify, and, finally, to determine the potential mandatory prison term and fine the Defendant will face by selecting the amount of drugs to be sold. Due process is offended on *292 these facts. It would appear that the instant case is even more egregious than Hunter. Unlike Hunter, the defendants in this case did not have to produce illegal drugs because the transaction was a "reverse sting", with the state supplying the drugs. The instant deal was also not recorded. Moreover, it was not supervised or assisted. Livermore decided the type of deal, the quantity of drugs and the manner and method in which to arrange the sale. Livermore is not just a material witness but he is the only state witness.

ISSUES ON APPEAL
The State argues that Glosson and Hunter are not applicable to the instant case because: (1) Hunter dealt with a different and narrower "substantial assistance" provision; (2) Livermore did not make the kind of persistent enticements or threats engaged in by the informant in Hunter; (3) Walsh and Anders were previously involved with narcotics in some way; (4) Walsh, not Livermore, contacted Anders. In our view, none of these factors materially distinguishes this case from the holding of Glosson that forbids prosecutions predicated upon improper contingent fee arrangements with unsupervised informants. Just as this court was bound to follow Glosson in our decision in Hunter, the trial court was bound to follow the holdings in Glosson and Hunter.
While it is true that the substantial assistance statute involved in Hunter did not authorize the arrangement the police made with the informant, that fact was not essential to the application of the Glosson due process test.[5] Similarly, the amendment to the statute to include a group of targets beyond the defendant's immediate associates in crime, has no effect on the applicability of the essential reasoning of Hunter, Glosson or Williamson. The decision in Hunter was predicated on the state's contingency arrangement with the informant who was offered "free reign to instigate and create criminal activities." 531 So.2d at 243. As noted in Glosson, the danger is that such arrangements "seem to manufacture, rather than detect, crime." 462 So.2d at 1084. We held in Hunter that the informant had "crossed the line drawn by Glosson." 531 So.2d at 243. The opinion noted:
As in Glosson, the informant here had an invaluable stake in making new cases: his own freedom. In our view such freedom constituted much more of an "enormous incentive" to "color his testimony" than the strictly monetary arrangement in Glosson. It is undisputed that the informant originated the criminal plan in his own mind, and instigated the commission of the crime solely to obtain his own freedom and relief from the mandatory $250,000.00 fine.
531 So.2d at 242 (footnote omitted).
The State also suggests that the due process analysis is not applicable to the instant case because Livermore was not especially persistent and did not threaten the defendants. The decisions in Glosson and Hunter are predicated on the incentives offered to the informant to manufacture new crimes, and not on the persistence of the informant to convince the defendants to participate. These circumstances may be relevant to a traditional entrapment defense, but not to a due process analysis.[6] Our conclusion is the same with regard to the contention that Walsh and Anders had a history of involvement with narcotics, even though it was not extensive. As noted above, Glosson holds that when the conduct of law enforcement officers is improper, the predisposition of the defendant is irrelevant.[7]
Finally, the State contends that since Livermore did not directly contact Anders or Hood, but only Walsh, any taint associated *293 with Walsh should not be extended to the appellees. In Hunter, we struggled with the same issue but held that since the focus of the due process claim is grounded on the government's misconduct, a defendant ensnared by that misconduct, even though not directly contacted by the informant, is also entitled to discharge. Of course, both defendants here did have some dealings with the informant prior to the consumation of the transaction. Our action on this issue is also controlled by the decision in Glosson which approved the discharge of several layers of defendants. In Glosson, the informant, Wilson, set up the transaction through Janet Moore, an acquaintance of two of Glosson's five codefendants. Those two in turn found the "actual" buyers (presumably the other codefendants) who purchased the drugs from Wilson. See State v. Glosson, 441 So.2d 1178 (Fla. 1st DCA 1983).
We affirm the decision of the trial court, but certify the same questions to the Florida Supreme Court as certified in Hunter, and as quoted above in footnote 3.
DOWNEY J., concurs.
LETTS, J., dissents without opinion.
NOTES
[1] The due process defense is similar to, but distinguishable from the traditional entrapment defense. In Glosson, the court ruled: "The due process defense based upon governmental misconduct is an objective question of law for the trial court, as opposed to the subjective predisposition question submitted in the usual entrapment defense." 462 So.2d at 1084. In Cruz v. State, 465 So.2d 516 (Fla. 1985), while not referring to the Glosson decision, the court discussed the objective and subjective views of entrapment:

The subjective view recognizes that innocent, unprejudiced, persons will sometimes be ensnared by otherwise permissible police behavior. However, there are times when police resort to impermissible techniques. In those cases, the subjective view allows conviction of predisposed defendants. The objective view requires that all persons so ensnared be released.[2]
We do not foresee a problem in providing two independent methods of protection in entrapment cases... .
We find, like the New Jersey court, that the subjective and objective entrapment doctrines can coexist. The subjective test is normally a jury question. The objective test is a matter of law for the trial court to decide.
Id. 520-521.
In Footnote 2, the court commented on the similarity between the "objective test" and the "due process test":
While the objective view parallels a due process analysis, it is not founded on constitutional principles. The justices of the United States Supreme Court who have favored the objective view have found that the court must "protect itself and the government from such prostitution of the criminal law. The violation of the principles of justice by the entrapment of the unwary into crime should be dealt with by the court no matter whom or at what stage of the proceedings the facts are brought to its attention." Sorrells [v. U.S.], 287 U.S. 435 at 457, 53 S.Ct. [210] at 218 [77 L.Ed. 413 (1932)] (Roberts, J., in a separate opinion). Justice Frankfurter also found that a judge's decision using the objective view would offer significant guidance for future official conduct, while a jury verdict offers no such guidance. Sherman [v. U.S.] 356 U.S. [369] at 385, 78 S.Ct. [819] at 827 [2 L.Ed.2d 848 (1958)] (Frankfurter, J., concurring in the result).
Id. at 520.
The court defined the objective portion of the entrapment defense: "Entrapment has not occurred as a matter of law where police activity (1) has as its end the interruption of a specific ongoing criminal activity; (2) utilizes means reasonably tailored to apprehend those involved in the ongoing criminal activity." 465 So.2d at 522.
In summary, Glosson holds that the due process defense is constitutionally based, whereas Cruz, in a footnote concerning the objective prong, states: "While the objective view parallels a due process analysis, it is not founded on constitutional principles." It appears, however, that the objective prong of the entrapment defense and the due process clause are substantively similar. Some courts have considered them together, while other courts, when the defenses were raised separately, have considered the defenses individually. In Taffer v. State, 504 So.2d 436 (Fla. 2d DCA), cause dismissed, 506 So.2d 1043, rev. denied, 511 So.2d 1000 (Fla. 1987) the defendant relied on Glosson and Cruz in his motion to dismiss. The trial court considered the two prongs of the entrapment defense (objective and subjective) separately. In State v. Garcia, 528 So.2d 76 (Fla. 2d DCA), rev. denied, 536 So.2d 244 (Fla. 1988) the defendants also argued entrapment as a defense distinct from due process. However, the court treated the objective entrapment defense as if it were the same as, or included in, the due process defense.
[2] While the opinions in Hunter and Glosson expressed concern for the potential for perjury on the part of the state's informant-witness, we believe the main policy concern of Glosson, Williamson, and the other cases cited in Glosson to be that the contingency fee arrangement might "cause an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit." Williamson, 311 F.2d at 444.
[3] We also certified the following questions of great public importance to the supreme court:

Does an agreement whereby a convicted drug trafficker will receive a substantially reduced sentence in exchange for setting up new drug deals and testifying for the state violate the holding in State v. Glosson?
Assuming the existence of a due process violation under Glosson, does Glosson's holding extend to a codefendant who was not the direct target of the government's agent?
531 So.2d at 243.
[4] Livermore had previously approached the Federal Drug Enforcement Agency about the deal but it was not interested. Livermore then approached the Broward County Sheriff's Office which accepted his plan to set up a deal with Anders. Livermore testified: A. Because I went to DEA with the case first. Q. With what case first? A. With this ten kilo case, okay, and they told me that they ran down Anders' file and Patrick Walsh's file, and they had no criminal background and they normally didn't do cases like that. Q. So, it wasn't enough for the DEA? A. Exactly. Q. It wasn't big enough? A. Not the term "big enough," but they just didn't like to get into these reverse cases.
[5] The informant in Hunter, in addition to being unsupervised, was actually released to set up deals in direct contravention of a mandatory sentence law and the then prevailing substantial assistance statute. This may be a relevant circumstance but not an essential one.
[6] See note 1.
[7] Id.