583 So.2d 1051 (1991)
William HEYDEL, Appellant,
v.
STATE of Florida, Appellee.
No. 90-2429.
District Court of Appeal of Florida, Fourth District.
July 3, 1991.
Rehearing and Rehearing Denied August 8, 1991.
*1052 Robert I. Barrar, Jr. and A. Hinda Klein of Rubin, Rubin & Fuqua, P.A., Miami, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and John Tiedemann, Asst. Atty. Gen., West Palm Beach, for appellee.
Rehearing and Rehearing En Banc Denied August 8, 1991.
ANSTEAD, Judge.
Appellant, William Heydel, challenges his convictions for trafficking in cocaine and conspiracy to traffic in cocaine. He contends that the trial court should have dismissed the charges because of the state's use of an informant to set up the drug deal for which he was charged. We affirm.

FACTS
Heydel and codefendants, Cheri and John Welles and Laurie Dodson, were arrested in connection with a drug deal involving undercover officer Steve Derstine and arranged through informant Joseph Palank. The three codefendants pled guilty and agreed to testify against Heydel at his trial.
In a motion to dismiss, Heydel alleged that had the informant, a convicted drug dealer, not arranged the drug deal in order to satisfy a substantial cooperation agreement with the state, Heydel would not have sold the cocaine to Derstine. An evidentiary hearing was conducted on the motion. Laurie Dodson admitted that she agreed to set up the purchase of a kilo of cocaine at the request of Palank, with whom she was having an affair, because she needed the money he offered for her help. Palank initially asked her to locate drugs in January of 1989. Palank threatened Dodson that if she could not arrange a deal, he would tell her husband about their affair. Dodson asked her friend, Jim Harris, to find the kilo. After Harris refused to help, Dodson asked her sister, a casual cocaine user, for help. Dodson's sister contacted a possible source who asked $17,500 for the kilo. This transaction fell through because the parties could not agree on the price.
Subsequently, Palank was arrested and pled guilty to charges of trafficking in cocaine unrelated to the present case. As part of a plea agreement, and in exchange for a decreased sentence, Palank agreed to testify against his codefendants and to cooperate with the police in investigating other drug activity. This agreement did not provide for any monetary payment to Palank for making drug deals, nor was there a requirement that the information he provided lead to any arrests or convictions. Pursuant to the agreement, Palank identified several people to the police whom he knew to be involved in the drug trade, including Laurie Dodson.
In May of 1989, after his plea and agreement with the state, Palank again contacted Dodson asking her to arrange another drug deal. Dodson contacted her sister, who contacted her source, who, in turn, contacted Heydel. Heydel produced the cocaine involved in the subsequent sale to undercover officer Derstine.

LAW
In State v. Glosson, 462 So.2d 1082 (Fla. 1985), the supreme court held that the due *1053 process rights of a number of people arrested in a drug sting were violated because of an agreement between the police and an informant who set up the drug sting, which provided the informant ten percent of civil forfeitures from the drug stings he arranged. The agreement obligated the informant to testify in criminal prosecutions resulting from the stings. The court concluded that the agreement improperly provided the informant a financial incentive to make new criminal cases and to color his testimony in order to secure payment. The holding in Glosson was based upon earlier federal and state decisions including Williamson v. United States, 311 F.2d 441 (5th Cir.1962). In Williamson, the Fifth Circuit explained the rationale behind its holding condemning the conduct of the government in paying informants to induce others to commit crimes:
The uncontradicted and unexplained testimony as to the terms of Moye's employment make it necessary that the judgments of conviction be reversed. It may possibly be that the Government investigators had such certain knowledge that Williamson and Lowrey were engaged in illicit liquor dealings that they were justified in contracting with Moye on a contingent fee basis, $200.00 for Williamson and $100.00 for Lowrey, to produce the legally admissible evidence against each of them. It may be also that the investigators carefully instructed Moye on the rules against entrapment and had it clearly understood that Moye would not induce them to commit a crime, but would simply offer them an opportunity for a sale. None of these facts or circumstances were developed in the evidence, though Moye's deposition had been taken months before the trial.
Without some such justification or explanation, we cannot sanction a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed. Such an arrangement might tend to a "frame up," or to cause an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit. The opportunities for abuse are too obvious to require elaboration.
311 F.2d at 444.
This court in Hunter v. State, 531 So.2d 239 (Fla. 4th DCA 1988), applied the Glosson holding to a scheme whereunder the informant would receive a reduced minimum mandatory prison term in exchange for setting up a specific number of drug transactions with anyone he could get to participate. The court noted that this agreement, directly affecting the informant's personal freedom, constituted an even greater incentive for the informant to create crime than the strictly financial arrangement in Glosson.
In State v. Anders, 560 So.2d 288 (Fla. 4th DCA 1990), this court restated our view of the major rationale in Glosson:
While the opinions in Hunter and Glosson expressed concern for the potential for perjury on the part of the state's informant-witness, we believe the main policy concern of Glosson, Williamson, and the other cases cited in Glosson to be that the contingency fee arrangement might "cause an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit." Williamson, 311 F.2d at 444.
Anders, 560 So.2d at 290 n. 2.
Similarly, the second district followed Glosson in State v. Embry, 563 So.2d 147, 149 (Fla. 2d DCA 1990), and expressed its concern that the informant might manufacture crime to receive a reduced sentence of probation. The Embry court pointed out that the informant was unsupervised and had initiated and handled all the negotiations leading up to the cocaine sale.

THIS CASE
After conducting an evidentiary hearing on the motion to dismiss, the trial court entered a written order which concluded:
No due process violation as referred to in State v. Glosson, 462 So.2d 1082 (Fla. 1985) and Hunter v. State, 531 So.2d 239 (Fla. 4th DCA 1988) occurred. The informant was not given free reign to create *1054 criminal activity where none existed. He did not go out into the community and "go fishing", (sic) he contacted Laurie Dodson, whom he had dealt with before.
We believe the record contains competent substantial evidence to support this conclusion and to distinguish the informant's activities here from those involved in the Glosson line of cases.
Undeniably, Palank entered into a substantial cooperation agreement with the state which affected his personal liberty. Palank's agreement with the police is distinguishable, however, from the agreement discussed in the Glosson line of cases, in that Palank was not "given free reign to instigate and create criminal activity where none before existed." See Hunter, 531 So.2d at 242. Palank did not enjoy the same free reign to induce anyone to participate in a drug deal. Instead, Derstine closely supervised Palank in arranging deals with people Palank had already identified as being involved in the drug trade. Palank had a long-standing relationship with Dodson. She admitted that well before Palank became an informant, he approached her about putting together a deal. Indeed, after an initial failure, she agreed to assist Palank in the future to arrange a substitute deal. Thus, a glaring distinction between this case and those cases where an informant's involvement violates due process is the prior and ongoing nature of the relationship between Palank and Dodson, which formed the foundation for Heydel's involvement in the instant transaction.
There was also testimony presented that Palank was closely supervised and had little involvement in the actual transaction. According to Dodson's admissions, Palank's participation was limited to his request that she get him a kilo of cocaine. Although there is testimony that Palank accompanied Officer Derstine to Dodson's house to complete the deal, it appears undisputed that Palank had no direct contact with Heydel.
Palank's agreement also contains no requirement that the information he provides to police result in a certain number of arrests or future prosecutions or a certain quantity of contraband. Hence, there was no specific requirement or pressure on Palank to make a certain number of cases in order to comply with the agreement. His cooperation, Derstine testified and the trial judge agreed, required only that he reveal parties he knew to be engaged actively in drug trade. While this might lead to arranging deals, Palank's ongoing relationship with Dodson, which included prior attempts to purchase cocaine, seems to negate the suggestion that he proceeded unsupervised to ensnare people not otherwise involved in illegal activity.
It is true that Derstine and Assistant State Attorney Vaughan testified that Palank might be expected to arrange transactions and would be in violation of his agreement if he did not assist in doing so. However, this testimony is not inconsistent with the evidence that Palank told police about those he knew in the drug trade and the police investigated those people, including Laurie Dodson. There was no testimony that Dodson or Heydel, or any of the members of the chain, were targeted by the police until Palank informed them of an ongoing deal set up through his preexisting relationship with Dodson.
In summary, we do not feel that the major concerns previously expressed in Glosson, Williamson, and the other cases discussed above are present in this case under the facts as established by the trial court. The degree and nature of the inducement to the informant, his close supervision, and, especially the limitation that he contact only people known by him to be involved in drugs all minimize the chance that otherwise innocent people will be induced into committing crimes.
In accordance with the above, we affirm the appellant's conviction and find no error in the trial court's order denying the motion to dismiss.
WARNER, J., and STEVENSON, W. MATTHEW, Associate Judge, concur.