596 So.2d 463 (1992)
STATE of Florida, Appellant,
v.
Richard ANDERS and William Hood, Appellees.
No. 89-1183.
District Court of Appeal of Florida, Fourth District.
March 11, 1992.
Motion for Certification and Stay of Mandate Denied April 14, 1992.
Robert A. Butterworth, Atty. Gen., Tallahassee, and John Tiedemann, Asst. Atty. Gen., West Palm Beach, for appellant.
Pamela I. Perry of Bierman, Shohat, Loewy & Perry, P.A., Miami, for appellee-Richard Anders.
ANSTEAD, Judge.
This case is before us on remand from the supreme court for further proceedings in accord with its holding and opinion in State v. Hunter, 586 So.2d 319 (Fla. 1991). In 1989, the trial court dismissed drug charges against Richard Anders and codefendant William Hood and this court affirmed. We now affirm the dismissal as to Anders but reverse as to Hood.

FACTS
The trial court dismissed the charges because of the government's use of a convicted informant in setting up the drug transaction with Anders and Hood. The trial court's order provides:
THIS CAUSE came on to be heard upon the Defendant's Motion to Dismiss alleging a violation of his right to Due Process of Law. The Court having studied the pleadings, heard argument of counsel, and being otherwise fully advised in the premises concludes that the Motion must be GRANTED based on the following findings of fact and conclusions of law:
FINDINGS OF FACT
The Defendant RICHARD ANDERS was arrested on April 19, 1988. On May 5, 1988, an Information was filed in the Circuit Court of Broward County charging ANDERS with trafficking in cocaine in violation of Florida Statute 893.135(1)(b)(3) and Florida Statute 893.03(2)(a)(4). ANDERS' conviction would carry a minimum mandatory 15 years *464 imprisonment without parole and a $250,000 fine.
In all material respects ANDERS' arrest stemmed directly from the efforts of a confidential informant named Jorge Livermore. Livermore had been arrested by the Plantation Police Department and charged with trafficking in 190 pounds of marijuana and possession of a hand gun. For his crimes, Livermore faced a three year minimum mandatory sentence at the time of his arrest.
In order to avoid his minimum mandatory sentence, Livermore made an agreement with the prosecutor that he would set-up an unspecified number of persons in order to lower his sentence. The agreement never was reduced to writing. Initially, Livermore cooperated with the Drug Enforcement Administration (DEA), with the understanding that his cooperation with the DEA would be credited as part of his cooperation with the State.
Livermore's initial cooperation with the DEA resulted in the arrest of a person wholly unrelated to the instant case after Livermore purchased one kilogram of cocaine from him. After procuring this one kilogram arrest, Livermore pled guilty to attempted trafficking in front of the Honorable Patti Englander Henning. However, Judge Henning was unwilling to sentence Livermore to community control based on this one kilogram arrest. Instead Livermore was told that to avoid serving any time in prison, he would have to make additional arrests. He was given no other guidance with respect to the additional arrests he would have to make except that the State Attorney made him aware that he would have to do more cooperation in order to further reduce his sentence and that he would have to make a Broward County case.
Livermore was given a performance deadline, a time limit in which he would have to procure more arrests in order to keep himself out of jail. In deposition, Livermore stated "if I didn't perform in "X" amount of time, I would be looking at 18 months [in jail]." (Deposition of Livermore at p. 20). According to Livermore, he felt pressured to provide other arrests.
Other than requiring an arrest in Broward County, Livermore was not given any guidelines or restrictions, oral or written, to guide his cooperation activities. He never was told to avoid entrapping others or, indeed, anything at all about how to deal or what to say to potential targets.[1]
During this time, Livermore used what he dubbed "his creativity" and concocted a story that he had friends who worked at Eastern Airlines (where Livermore had, in fact, worked) who had found 20 kilograms of cocaine and were willing to sell it for Seven Thousand Dollars ($7,000) a kilogram for resale at a higher amount. He stated that he decided to conduct a reverse sting in which he would offer drugs for money rather than money for drugs, because he "just felt personally would be easier to set-up a case that way." He also chose the weight that he would offer.
Livermore first contacted Patrick Walsh, a person with whom he had worked at a Miami stock brokerage house. Livermore had seen Walsh supply small personal use amounts of cocaine to people in a few isolated instances, but admitted that he went to him with this trafficking-quantity deal as just a shot in the dark:
Q: Is it a fair statement that in an effort to fulfill your obligation with the State of Florida, you decided, "I am going to go to Walsh and see if I can develop anything there."?
Livermore: Correct. (Deposition of Livermore at p. 30-1)
Livermore then had lunch with Walsh and told him his Eastern Airlines story and offered him 20 kilograms of cocaine for Seven Thousand Dollars ($7,000) a kilogram. Walsh said that he would consider the deal and get back to him.
According to Livermore, the next thing he knew, ANDERS was "in the middle of the picture... . All of a sudden, [ANDERS] is involved with it and [Walsh]  I am not talking to [Walsh] anymore. I *465 am talking to Rick." Livermore had not seen Walsh or ANDERS for seven or eight months before he approached them with the reverse sting. ANDERS told him that he knew a man from out-of-town who sometimes went to West Palm Beach who might be interested in the narcotics. This person turned out to be Defendant Hood.
Livermore had no reason to believe that ANDERS ever had engaged in drug trafficking. In fact, Livermore, stated that just as he knew that Walsh had never dealt quantity of drugs before, all that he knew about ANDERS was that ANDERS and he had "smoked a couple of joints of marijuana" and he once bought a very small amount of marijuana from ANDERS. After several phone calls with ANDERS, Livermore felt that he had sufficiently interested ANDERS in the transaction and he contacted the DEA to tell them about the deal he had put together. However, the DEA declined to pursue the case because they had checked ANDERS and Walsh's name and found no criminal background on either and "didn't normally do cases like this." (Deposition of Livermore at p. 39). After the DEA refused to work with Livermore, he approached Plantation Detective Paul Liccardo, the Detective with whom he had originally worked. Liccardo introduced Livermore to Detective Joe Hoffman and Detective Dennis Cracraft of the Broward County Sheriff's Department. Unlike the DEA, the detectives were interested in consummating the deal. Cracraft and Hoffman met once with Livermore and Livermore told them about the Eastern Airlines story he had used to lure Walsh and ANDERS. The detectives agreed to go along with the scenario. The detectives did not ask Livermore if ANDERS had any criminal background or if he had any reason to believe that they were involved in narcotics trafficking. In addition, Livermore was never given any guidelines with respect to how to behave with ANDERS. The detectives never told Livermore what he could or could not say or how to avoid entrapment. The detectives also never told Livermore to wear a body bug, never offered to substitute for him during the transaction, and never took any steps to surveil Livermore as he met with the Defendants. As a result of Livermore's totally free reign, he is the only witness to his contacts with ANDERS; there exists no way beyond a potential swearing contest, to dispute what Livermore might say about these contacts.
As Livermore's sentencing date of April 20 was rapidly approaching, Livermore had to press the officers and Defendants to consummate the transaction so that it occurred before his sentencing. Ultimately, after one failed transaction, ANDERS and co-defendant Hood drove to a pre-arranged location in Fort Lauderdale where the cocaine was produced by the officers and the Defendants were arrested.
The very next day, Livermore was placed on community control, given a withhold of adjudication and permission to carry a firearm. He was also promised that his employer would not be informed of his arrest. At the moment that ANDERS and Hood headed to the Broward County Jail, Livermore walked away from jail forever.
CONCLUSION OF LAW
Florida precedent teaches that due process will not allow law enforcement officers to place informants under ultimatum and set them about the community to find other citizens to arrest. State v. Glosson, 462 So.2d 1082 (Fla. 1985); Hunter v. State, 531 So.2d 239 (Fla. 4th DCA 1988), cert. granted, ___ So.2d ___ (Fla. 1989). Such agreements are an invitation to perjury. Id.

Thus, due process of law will not tolerate the law enforcement techniques employed in this case. Sending an untrained informant out into the community, with no control, no supervision and not one word of guidance or limitation about whom he may approach or what he should do was an invitation to trouble. Livermore's uncontrolled activities in this *466 case are ever more egregious than the activities in Glosson and Hunter. Here, Livermore was allowed to create a trafficking offense and offender where none previously existed, to engage in negotiations the contents of which no independent witness can verify, and, finally, to determine the potential mandatory prison term and fine the Defendant will face by selecting the amount of drugs to be sold. Due process is offended on these facts. See also, State v. Evans, 14 FLW 140 [537 So.2d 639] (2nd DCA January 13, 1989). Therefore, it is
ORDERED AND ADJUDGED:
That the Motion to Dismiss on the basis of a due process violation filed by RICHARD ANDERS and WILLIAM HOOD is hereby GRANTED.
Livermore: Fair Statement.
Q: And you fished for a 10 kilo deal; correct?
Livermore: That is what popped into my head.
(Deposition of Livermore at p. 22)
* * * * * *
Q: Did he [the prosecutor] put any other restrictions on your future cooperation, other than it would have to be for Broward County?
Livermore: (Witness shaking head) ... No.
(Deposition of Livermore at p. 19-20.
* * * * * *
Q: Were there any other restrictions put on you in terms of your performance.
Livermore: No.
Q: So you basically were told to go out there and "bring us something else?"
Livermore: Yes.
Q: And that's what you did?
Livermore: Exactly.
(Deposition of Livermore at p. 21.
[1] At deposition, Livermore's described his activities as follows:
Q: So, you simply went out in the community and went fishing; fair statement?

LAW
In Glosson v. State, 462 So.2d 1082 (Fla. 1985), the supreme court held that it was a violation of a defendant's due process rights for the government to hire an informant to set up drug deals and to pay the informant on a contingency basis, depending on the outcome of the criminal prosecutions against those defendants set up in the deals. In State v. Hunter, 586 So.2d 319 (Fla. 1991), the supreme court rejected this court's application of Glosson to the government's promise of lenient treatment to convicted drug dealers in exchange for their efforts in setting up new drug deals.[1] The court limited the holding of Glosson to its facts, particularly the fact that the informant would only be paid if he testified in a prosecution that resulted in a conviction. The court also rejected this court's application of the due process defense to a codefendant who was not the direct target of the government's agent.
Notwithstanding its limitation of the Glosson rule, the supreme court held that the government's conduct in Hunter was violative of the law of entrapment set out in Cruz v. State, 465 So.2d 516 (Fla.), cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985). Hunter, 586 So.2d at 321. Applying Cruz, the supreme court approved the dismissal of charges against a defendant directly contacted by the government informant, but reinstated the conviction of a codefendant not directly drawn into the scheme by the government informant.
Cruz adopted an objective threshold test for the judicial evaluation of entrapment, while still recognizing an additional subjective test based on predisposition that would ordinarily be decided by the finder of fact. As to the objective test, the court held that as a matter of law, there was no entrapment if police activity:
(1) has as its end the interruption of a specific ongoing criminal activity [the predisposition element]; and

*467 (2) utilizes means reasonably tailored to apprehend those involved in the ongoing criminal activity [the objective entrapment element].
The first prong of this test addresses the problem of police "virtue testing," that is, police activity seeking to prosecute crime where no such crime exists but for the police activity engendering the crime. As Justice Roberts wrote in his separate opinion in Sorrells [v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932)], "Society is at war with the criminal classes," 287 U.S. at 453-54, 53 S.Ct. at 217. Police must fight this war, not engage in the manufacture of new hostilities.
The second prong of the threshold test addresses the problem of inappropriate techniques. Considerations in deciding whether police activity is permissible under this prong include whether a government agent "induces or encourages another person to engage in conduct constituting such offense by either: (a) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or (b) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it." Model Penal Code § 213 (1962).
Cruz, 465 So.2d at 522 (footnote omitted).
Initially, as we noted in our earlier opinion in this case,[2] the supreme court held in Cruz that its analysis was similar to, but not founded on constitutional principles:
While the objective view parallels a due process analysis, it is not founded on constitutional principles. The justices of the United States Supreme Court who have favored the objective view have found that the court must "protect itself and the government from such prostitution of the criminal law. The violation of the principles of justice by the entrapment of the unwary into crime should be dealt with by the court no matter by whom or at what stage of the proceedings the facts are brought to its attention." Sorrells, 287 U.S. at 457, 53 S.Ct at 218 (Roberts, J., in a separate opinion). Justice Frankfurter also found that a judge's decision using the objective view would offer significant guidance for future official conduct, while a jury verdict offers no such guidance. Sherman [v. United States], 356 U.S. 369 at 385, 78 S.Ct. [819] at 827 [2 L.Ed.2d 848 (1985)] (Frankfurter, J., concurring in the result).
Cruz, 465 So.2d at 520 n. 2. Subsequently, however, Cruz was applied and given a constitutional base in Hunter: "By focusing on police conduct, this objective entrapment standard includes due process considerations." Hunter, 586 So.2d at 322. See Strickland v. State, 588 So.2d 269 (Fla. 4th DCA 1991). In Hunter, on facts similar to those involved herein, the supreme court held that the government had violated both elements of the Cruz entrapment test in its use of a convicted drug dealer to create drug crimes.

HOOD
Initially, we hold that the charges against Hood must be reinstated. In Cruz, the court declared:
The subjective view recognizes that innocent, unpredisposed, persons will sometimes be ensnared by otherwise permissible police behavior. However, there are times when police resort to impermissible techniques. In those cases, the subjective view allows conviction of predisposed defendants. The objective view requires that all persons so ensnared be released.

Cruz, 465 So.2d at 520 (footnote omitted) (emphasis supplied). Similarly, in Glosson, also involving a reverse sting, the court approved the discharge of several layers of defendants including Glosson and others not the direct target of Wilson, a paid government informant:
"In this case, Wilson set up the alleged transaction through Janet Moore, an acquaintance *468 of appellees Gonzalez and Smith. Wilson was the seller, Gonzalez and Smith allegedly found buyers."
State v. Glosson, 441 So.2d 1178 (Fla. 1st DCA 1983), approved, 462 So.2d 1082 (Fla. 1985).
However, the supreme court specifically held in Hunter that a codefendant, brought into the scheme by a defendant directly targeted by the government's agent, has no standing to invoke the constitutional due process protections of Cruz. Under the findings of fact by the trial court, Hood was not directly drawn into the scheme by the government's agent and, hence, he is not entitled to claim the protection of Cruz and Hunter.

ANDERS
Finally, we must apply the Cruz analysis, as adopted in Hunter, to determine the propriety of the state's actions involving Anders. Hunter found both prongs of the Cruz objective test had been violated:
Diamond had become the state's agent, and his acts must be construed as "police activity." His activities, however, meet neither part of the Cruz test, let alone both, because there was no "specific ongoing criminal activity" until Diamond created such activity in order to meet his quota. Therefore, as in Cruz, Conklin established entrapment as a matter of law, and the trial court erred in denying his motion for judgment of acquittal based on entrapment. Cf. Myers; Marrero v. State, 493 So.2d 463 (Fla. 3d DCA 1985), review denied, 488 So.2d 831 (Fla. 1986).
Hunter, 586 So.2d at 322. It is apparent from its detailed order that the trial court found that Livermore, like Diamond in the Hunter case, engaged in improper means to induce Anders into the reverse drug sting, and also found that there was no specific ongoing criminal activity by Anders prior to the informant's scheme involving the purchase and resale of a non-existent suitcase full of cocaine. And, as in Hunter, the case for objective entrapment as defined in Cruz is not substantially diminished because Anders, like the target defendant in Hunter, had used marijuana in small quantities. Under Hunter, then, it would appear that as to Anders, there was entrapment as a matter of law.
Accordingly, we affirm the trial court's order of discharge as to Anders, but reverse as to Hood and remand this cause for further proceedings in accord herewith.
DOWNEY and LETTS, JJ., concur.
NOTES
[1] See Hunter v. State, 531 So.2d 239 (Fla. 4th DCA 1988), approved in part; quashed in part, 586 So.2d 319 (Fla. 1991).
[2] See Anders v. State, 560 So.2d 288, 289 n. 1 (Fla. 4th DCA 1990), vacated, 587 So.2d 455 (Fla. 1991).