586 So.2d 319 (1991)
STATE of Florida, Petitioner,
v.
David William HUNTER and Kelly I. Conklin, Respondents.
No. 73230.
Supreme Court of Florida.
August 29, 1991.
*320 Robert A. Butterworth, Atty. Gen., and John Tiedemann and Richard G. Bartmon, Asst. Attys. Gen., West Palm Beach, for petitioner.
Christopher A. Grillo, Fort Lauderdale, for respondent, David William Hunter.
Fred Haddad, Fort Lauderdale, for respondent, Kelly I. Conklin.
McDONALD, Justice.
We review Hunter v. State, 531 So.2d 239 (Fla. 4th DCA 1988), in which the district court certified two questions as being of great public importance. We have jurisdiction pursuant to article V, section 3(b)(4), Florida Constitution, and quash Hunter.
The chief prosecution witness in the instant case, Ron Diamond, had been convicted of drug trafficking and sentenced to fifteen years in prison and a $250,000 fine. Diamond sought a sentence reduction under subsection 893.135(3), Florida Statutes (1985), which provided in pertinent part that a prosecutor can request that the sentencing court reduce or suspend a sentence for drug trafficking if the defendant "provides substantial assistance in the identification, arrest, or conviction of any of his accomplices, accessories, coconspirators, or principals." Based on this statute, the trial court agreed to release Diamond at various times both before and after his conviction so that he could assist the police.
Because Diamond could not produce any past accomplices the state offered him a "contract" if he assisted in identifying and arresting future accomplices. The major condition of the agreement was that Diamond's assistance had to result in the confiscation of at least four kilograms of cocaine within a certain period of time. Diamond subsequently assisted the police in "making" several new drug cases, but fell short of his cocaine quota by one kilogram. The trial court then permitted Diamond to remain at liberty if within sixty days he gave the police information that led to the confiscation of the remaining kilogram.
During the sixty-day period, Diamond noticed that another resident of his apartment complex, Kelly Conklin, openly smoked marijuana. Conklin, a twenty-one-year-old recent graduate of an art school, had no prior criminal record. He lived with his pregnant girlfriend and worked for an advertising firm run by David Hunter. Approaching Conklin, Diamond asked for assistance in obtaining drugs, but Conklin could not provide any sources for the drugs that Diamond wanted. Diamond became more insistent and began telephoning Conklin almost daily. Eventually Conklin turned to Hunter, who agreed to help find drugs to sell to Diamond.[1] Hunter sought out a former employee who provided the drugs, but, in doing so, insisted that Hunter, not Conklin, complete the transaction.[2] When Hunter attempted to close the transaction with the police undercover buyers, both he and Conklin were arrested. They were charged with trafficking and conspiracy and raised entrapment under Cruz v. State, 465 So.2d 516 (Fla.), cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985), as a defense. The jury, however, convicted them as charged, and they received minimum mandatory sentences of fifteen years' imprisonment as well as $250,000 fines.
Hunter and Conklin raised several issues on appeal, including whether, under State v. Glosson, 462 So.2d 1082 (Fla. 1985), Diamond's conduct violated their due process rights so that the charges against them should have been dismissed. The district court decided the appeal on the Glosson *321 issue and did not address the other issues. After finding a due process violation, the court certified the following questions:
Does an agreement whereby a convicted drug trafficker will receive a substantially reduced sentence in exchange for setting up new drug deals and testifying for the state violate the holding in State v. Glosson?

Assuming the existence of a due process violation under Glosson, does Glosson's holding extend to a codefendant who was not the direct target of the government's agent?
Hunter, 531 So.2d at 243. We find Glosson distinguishable from the instant case and hold that the district court should not have decided the case as it did. Therefore, we answer the certified questions in the negative as qualified and explained below.
In Glosson the state and an informant made a contingent-fee agreement under which the informant would receive ten percent of all civil forfeitures in exchange for his testimony and cooperation in the criminal prosecutions which produced the forfeitures. The informant "had to testify and cooperate in criminal prosecutions in order to receive his contingent fee from the connected civil forfeitures, and criminal convictions could not be obtained ... without his testimony." Glosson, 462 So.2d at 1085 (emphasis added). Under such circumstances, maintaining the integrity of a fair prosecution superseded prosecuting defendants who might have been guilty. Because this Court found the misconduct in Glosson so egregious, we stated and held:
We can imagine few situations with more potential for abuse of a defendant's due process right. The informant here had an enormous financial incentive not only to make criminal cases, but also to color his testimony or even commit perjury in pursuit of the contingent fee. The due process rights of all citizens require us to forbid criminal prosecutions based upon the testimony of vital state witnesses who have what amounts to a financial stake in criminal convictions.
Accordingly, we hold that a trial court may properly dismiss criminal charges for constitutional due process violations in cases where an informant stands to gain a contingent fee conditioned on cooperation and testimony in the criminal prosecution when that testimony is critical to a successful prosecution.

Id. (emphasis added). We reiterate that an agreement giving someone a direct financial stake in a successful criminal prosecution and requiring the person to testify in order to produce a successful prosecution is so fraught with the danger of corrupting the criminal justice system through perjured testimony that it cannot be tolerated.
Gaining or preserving one's liberty could produce as great an interest in the outcome of a criminal prosecution as a financial interest, but that is not the case here. Glosson is very fact specific, and several facts distinguish the instant case from Glosson. Although Diamond testified against Conklin and Hunter, his agreement with the state did not require that he do so. Rather, Diamond had to produce a stated amount of cocaine. The reduction of his sentence depended upon reaching a quota, not upon his testifying or upon the state's obtaining convictions. In Glosson, on the other hand, the informant would be paid only if he testified and the state won a conviction. The possibility, perhaps even probability, of perjury present in Glosson was much greater than in the instant case. Thus, we conclude that Glosson does not control this case.
In Myers v. State, 494 So.2d 517 (Fla. 4th DCA 1986), the district court applied Cruz, on which Conklin and Hunter relied at trial, to facts very similar to those in the instant case. In fact, in his brief Conklin characterizes Myers as "the proverbial `case on all fours' with the instant matter." We agree and hold that the district court should have decided this appeal on the entrapment issue rather than under Glosson.
In Cruz we stated that the state must "establish initially whether `police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental *322 power.'" 465 So.2d at 521 (quoting Sherman v. United States, 356 U.S. 369, 382, 78 S.Ct. 819, 825, 2 L.Ed.2d 848 (1958), Frankfurter, J., concurring in result). To guide trial courts, we set out a threshold test for establishing entrapment: "Entrapment has not occurred as a matter of law where police activity (1) has as its end the interruption of a specific ongoing criminal activity; and (2) utilizes means reasonably tailored to apprehend those involved in the ongoing criminal activity." Id. at 522 (emphasis added). By focusing on police conduct, this objective entrapment standard includes due process considerations.
Diamond had become the state's agent, and his acts must be construed as "police activity." His activities, however, meet neither part of the Cruz test, let alone both, because there was no "specific ongoing criminal activity" until Diamond created such activity in order to meet his quota. Therefore, as in Cruz, Conklin established entrapment as a matter of law, and the trial court erred in denying his motion for judgment of acquittal based on entrapment. Cf. Myers; Marrero v. State, 493 So.2d 463 (Fla. 3d DCA 1985), review denied, 488 So.2d 831 (Fla. 1986).
Conklin's benefitting from the entrapment defense, however, does not mean that Hunter should too. Although Diamond's acts amounted to entrapment of Conklin, the middleman, he had minimal telephone contacts with Hunter. When a middleman, not a state agent, induces another person to engage in a crime, entrapment is not an available defense. State v. Garcia, 528 So.2d 76 (Fla. 2d DCA), review denied, 536 So.2d 244 (Fla. 1988); Acosta v. State, 477 So.2d 9 (Fla. 3d DCA 1985); State v. Perez, 438 So.2d 436 (Fla. 3d DCA 1983). Conklin, not Diamond, brought Hunter into the scheme, and Hunter's involvement was wholly voluntary even though his motive may have been benevolent. Hunter, therefore, should not have been allowed to raise entrapment. Also, defendants cannot raise "due process violations allegedly suffered by third parties." United States v. Valdovinos-Valdovinos, 743 F.2d 1436, 1437 (9th Cir.1984), cert. denied, 469 U.S. 1114, 105 S.Ct. 799, 83 L.Ed.2d 791 (1985); accord United States v. Payner, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). Thus, Hunter's outrageous conduct/due process claim should not be heard.
Accordingly, although we disagree with the rationale of the district court, we approve its result as to Conklin, but quash its opinion entirely as to Hunter. We remand with instructions that the trial court's denial of Conklin's motion for judgment of acquittal be reversed and that Hunter's conviction be affirmed.
It is so ordered.
SHAW, C.J., and OVERTON and GRIMES, JJ., concur.
BARKETT, J., concurs in part and dissents in part with an opinion, in which KOGAN, J., concurs.
KOGAN, J., concurs in part and dissents in part with an opinion, in which BARKETT, J., concurs.
BARKETT, Justice, concurring in part, dissenting in part.
I agree with the majority regarding Conklin. I believe, however, that the rationale precluding the conviction of Conklin ineluctably leads to applying the same conclusion to Hunter. Accordingly, I concur with Justice Kogan's analysis. Because the state used illegal means to induce Diamond to "make" these cases against both Hunter and Conklin, we are bound under principles of due process, ethics, and public policy to reverse these convictions.
I also write to emphasize, as this case illustrates, the dangers resulting from the permitted abuse of the concept of "substantial assistance." If properly used by law enforcement, "substantial assistance" can be a laudable and workable tool in the war against drug-related crime. "Substantial assistance" was intended to induce defendants to give information to the authorities about accomplices, accessories, coconspirators, principles, or others known to the *323 defendant or to the state to have been engaged in or to be presently engaging in, the trafficking of controlled substances.[3] But, as this case so aptly illustrates, some have allowed "substantial assistance" to go well beyond both what the legislature intended and what the legislature is constitutionally permitted to authorize. As in this instance, it is being used to create new criminal activity under the guise of taking criminals off the streets. "[T]he legislature cannot authorize an informant to manufacture crime." State v. Embry, 563 So.2d 147, 149 (Fla. 2d DCA 1990).
"Substantial assistance" is useful to society when applied to someone deep in the drug world. Generally, a first-time offender, or a mere "mule" or drug courier,[4] would not have available the same kind of information to trade that an experienced drug "kingpin" would have. Ironically, "substantial assistance" permits those who are the most culpable, and therefore, most knowledgeable, to obtain probation or reduced sentences in exchange for their knowledge. Those who are the least culpable, because of their limited involvement and knowledge, have little to trade, and accordingly they are left to suffer the greater punishment of the minimum mandatory prison sentences.
The abuse of "substantial assistance" creates a worse, and in my view, indefensible, irony. Persons with the least exposure to the criminal element have the greatest terror of incarceration. Likewise, they are probably the candidates most likely to successfully complete probation and turn away from any further criminal conduct. However, we use their fear, not to turn them away from crime, but rather to induce them to create more crime.[5] Thus, instead of encouraging lawbreakers to reject the criminal life-style, this practice requires them to remain in the criminal milieu and generate more crime.
Moreover, exposure to danger should not be a condition of probation. In this case, there was apparently little danger to Diamond. This is not always the case. Untrained and unsupervised informants may be forced into dangerous situations that they are ill-equipped to handle, simply as a condition of probation under the "substantial assistance" statute. "[I]nformers frequently put their lives on the line to make these cases." Krajewski v. State, 587 So.2d 1175, 1183 (Fla. 4th DCA 1991). Surely, due process does not permit this kind of probationary condition.
I do not quarrel with any conditions of "substantial assistance" that would require an offender to report information obtained in the natural course of living. For example, in this case Diamond observed Conklin openly smoking marijuana. Diamond could have relayed this information to the police, and should be encouraged to do so to prevent crime. This is a far cry from generating a crime for the police to solve, a crime that would never have been committed but for the police action in the first place.
Finally, I am deeply concerned with the complicity of the courts in this process. Diamond was convicted of drug offenses and sentenced to the minimum mandatory term of fifteen years' imprisonment in May 1982. However, the trial court allowed Diamond to stay on the streets to "make cases" for the state until Diamond finally *324 snared Conklin and Hunter in mid-October 1982, after which the court reduced Diamond's sentence. The trial court had no authority to keep Diamond out of jail and reduce his lawful sentence five months after it imposed sentence. See Fla.R.Crim.P. 3.800(b) (a trial court may modify a legal sentence within sixty days after imposing sentence); see also § 893.135(2), Fla. Stat. (1981) ("with respect to any person who is found to have violated [drug trafficking laws], adjudication of guilt or imposition of sentence shall not be suspended, deferred, or withheld, nor shall such person be eligible for parole prior to serving the minimum mandatory term of imprisonment prescribed by this section."). As Judge Anstead, writing for the court, observed, "Diamond was actually out of jail illegally at the time he induced Conklin to traffic in cocaine." Hunter v. State, 531 So.2d 239, 243 (Fla. 4th DCA 1988). Thus, we have allowed the abuse of "substantial assistance" to infect the courts themselves.
It would be neither logical nor constitutional for the legislature to spend our financial resources to create crime. A society that permits violation of the law as a means of convicting a lawbreaker is just as lawless as the individual it convicts. I cannot believe that the ends of law enforcement ever justify the means of lawbreaking.
Accordingly, I am persuaded that "substantial assistance," when used as in this case to force a defendant to "make" new crimes, is legally wrong in its violation of due process, morally reprehensible, and directly antithetical to the public good. It is, in a twist worthy of Charles Dickens, simply using the law to break the law.
KOGAN, J., concurs.
KOGAN, Justice, concurring in part, dissenting in part.
I fully concur in that part of the majority opinion finding a due process violation in the way the police informant interacted with Conklin. I write separately on this point only to elaborate my understanding of what the Court is doing today.
In Cruz v. State, 465 So.2d 516, 521 (Fla.), cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985), this Court held that Florida law simultaneously recognizes the existence of both "subjective" and "objective" entrapment defenses. "Subjective entrapment" is the theory generally followed in the federal system. It focuses on whether the defendant was predisposed to commit a particular offense. If so, entrapment usually is not an available defense no matter what conduct the police may have used in apprehending the defendant. In any event, subjective entrapment typically is not a question of law, but a question of fact for the fact finder to decide. Id. at 520-21 (citing Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).
"Objective entrapment," on the other hand, focuses on the objective acts leading up to the defendant's arrest, not on the defendant's predisposition. The question is whether "police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." Cruz, 465 So.2d at 521 (quoting Sherman v. United States, 356 U.S. 369, 382, 78 S.Ct. 819, 825, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring in result). Although the United States Supreme Court has never adopted an objective entrapment analysis, we did so as a matter of Florida law in Cruz:
Entrapment has not occurred as a matter of law where police activity (1) has as its end the interruption of a specific ongoing criminal activity; and (2) utilizes means reasonably tailored to apprehend those involved in the ongoing criminal activity.
The first prong of this test addresses the problem of police "virtue testing," that is, police activity seeking to prosecute crime where no such crime exists but for the police activity engendering the crime. As Justice Roberts wrote in his separate opinion in Sorrells, "Society is at war with the criminal classes," 287 U.S. at 453-54, 53 S.Ct. at 217. Police must fight this war, not engage in the manufacture of new hostilities.

*325 The second prong of the threshold test addresses the problem of inappropriate techniques. Considerations in deciding whether police activity is permissible under this prong include whether a government agent "induces or encourages another person to engage in conduct constituting such offense by either: (a) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or (b) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it." Model Penal Code § 2.13 (1962).
Cruz, 465 So.2d at 522. The question of whether police conduct meets the Cruz objective standard is one entirely of law. Id. at 521.
The Cruz Court did not directly confront whether the objective test finds its origin in the Florida Constitution, although it did note that the federal advocates of the objective standard had not claimed a constitutional basis for their views. Id. at 520 n. 2 (discussing opinions of federal justices favoring objective standard). The Cruz Court did, however, note that the objective entrapment defense involves issues that substantially overlap due process concerns. Id. at 519 n. 1 (citing cases so holding).
Today, the majority opinion resolves the question of the source of Florida's objective entrapment defense. The majority holds that "this objective entrapment standard includes due process considerations." Majority op. at 322. It goes on to deny Hunter's claim because he allegedly is vicariously asserting the due process rights of Conklin. Id. at 322. Because the federal system does not recognize the objective entrapment defense, the majority opinion clearly is premised entirely on the due process clause of the Florida Constitution. Art. I, § 9, Fla. Const. I fully concur in this conclusion. Indeed, I believe it necessarily flows from our prior case law.
In Glosson, for example, we held that the due process clause of the Florida Constitution, article I, section 9, restricts the ability of the state to apprehend criminal wrongdoers if the state does so through serious misconduct of its own. Glosson, 462 So.2d at 1084-85. The Glosson Court did not expressly characterize this as an objective entrapment analysis, but a review of that case shows that it indeed was. Glosson merely confronted a particularly egregious violation. Thus, although I agree that both this case and Glosson properly are decided based on Florida due process concerns, I disagree with that part of the majority analysis suggesting that Glosson created a defense distinct from objective entrapment. The two plainly are coextensive.
Indeed, Glosson obviously was concerned with whether "police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." Cruz, 465 So.2d at 521 (quoting Sherman v. United States, 356 U.S. 369, 382, 78 S.Ct. 819, 825, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring in result). In Glosson, the state had offered the confidential informant a "contingent fee" arrangement. This arrangement provided that, if the informant obtained information about and testified against defendants, he then would be paid a percentage of any civil forfeitures associated with the trials. We noted that there are
few situations with more potential for abuse of a defendant's due process right. The informant here had an enormous financial incentive not only to make criminal cases, but also to color his testimony or even commit perjury in pursuit of the contingent fee. The due process rights of all citizens require us to forbid criminal prosecutions based upon the testimony of vital state witnesses who have what amounts to a financial stake in criminal convictions.
Glosson, 462 So.2d at 1085.
In deciding Glosson we drew upon an opinion of our sister Court in New York, People v. Isaacson, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978). See Glosson, 462 So.2d at 1085. The Isaacson Court dealt with a situation in which police had brutalized and deceived an informant to encourage him to entrap others, and the *326 informant subsequently pleaded with a friend in another state to supply him with drugs. Later, the informant engaged in an elaborate series of maneuvers to trick his friend into crossing a state line so that a drug deal could be consummated in the jurisdiction of the police for whom the informant worked. Isaacson, 406 N.Y.S.2d at 720-721, 378 N.E.2d at 84.
The New York court determined that this type of police conduct offended due process, requiring that the defendant's conviction be vacated. It concluded that
[s]eparately considered, the items of conduct may not rise to a level justifying dismissal but viewed in totality they reveal a brazen and continuing pattern in disregard of fundamental rights.
Id. I believe the majority opinion issued today is in general harmony with the principles announced by the New York court. Clearly, Florida's own due process, objective entrapment defense would prohibit similar conduct on the part of police and their informants in this state. Art. I, § 9, Fla. Const.
Indeed, Florida's due process provision, like that in New York, was meant to guarantee
that every person's right to life, liberty and property is to be accorded the shield of inherent and fundamental principles of justice. Due process of law guarantees respect for personal immunities "so rooted in the traditions and conscience of our people as to be ranked as fundamental."
Isaacson, 406 N.Y.S.2d at 718, 378 N.E.2d at 82 (citations omitted).
It is clear that the concerns elaborated in Glosson and the cases on which it relied disclose that they are essentially aimed at the same concerns as the objective entrapment analysis used in Cruz. The opinions in Glosson, Isaacson, and Cruz forbid prosecution if government agents are "seeking to prosecute crime where no such crime exists but for the police activity engendering the crime." Cruz, 465 So.2d at 522. These cases likewise forbid prosecution if a government agent "induces or encourages another person to engage in conduct constituting [an] offense by either: (a) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or (b) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it." Id. (quoting Model Penal Code § 2.13 (1962)).
Indeed, the New York court in Isaacson  cited in our own Glosson opinion  used a highly similar analysis. The Isaacson court held that the following nonexclusive list of factors should be considered in reviewing claims of a due process violation:
(1) [W]hether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity; (2) whether the police themselves engaged in criminal [or] improper conduct repugnant to a sense of justice; (3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness; and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace.
Isaacson, 406 N.Y.S.2d at 719, 378 N.E.2d at 83 (citations omitted). The four factors used in Isaacson are another slightly more detailed way of looking at the two-part test used in Cruz.
I stress, however, that due process does not bar the state from using paid informants or even from using stealth and strategy in the apprehension of lawbreakers. Art. I, § 9, Fla. Const. As the New York Court noted:
To be sure, "[c]riminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer." However, ... "[n]o matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of *327 society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society."
Isaacson, 406 N.Y.S.2d at 721, 378 N.E.2d at 85 (citation omitted) (quoting Sherman v. United States, 356 U.S. 369, 372, 382-83, 78 S.Ct. 819, 820-21, 826, 2 L.Ed.2d 848 (1958) (majority opinion and opinion of Frankfurter, J., concurring)). Accord Cruz, 465 So.2d at 519. Nor does due process bar the use of informants where the state employs them as the result of reasonable, objective suspicion that the particular persons under investigation already are engaging in criminal conduct.
I dissent from the majority's conclusion that Hunter may not also resort to the objective entrapment defense. Based on this record, I believe the taint flowing from Diamond's activities applies equally to the prosecution of both Hunter and Conklin. The record discloses that neither Conklin nor Hunter would have been involved in the attempted sale of cocaine but for Diamond's intensive and unrelenting efforts to meet his "cocaine quota." Diamond had direct contact with both Hunter and Conklin, even though it was Conklin who initially brought Hunter into the scheme. After meeting Hunter, Diamond used the same techniques against him that were employed against Conklin. Diamond's direct interaction with Hunter was extensive.
This informant's activities in essence manufactured crime in which neither Hunter nor Conklin would have participated except for the police activities. On these facts, Hunter is not vicariously attempting to assert Conklin's due process rights; he is asserting his own. Thus, the Glosson violation applies equally to Conklin and Hunter, even though only Conklin was initially targeted by the informant. In this vein, the question of either Hunter or Conklin's predisposition is not dispositive of a claim of objective entrapment, for the reasons I have noted earlier. This issue is resolved solely by reference to the conduct of the police informant. I believe the majority is improperly influenced by evidence suggesting that Hunter was predisposed to commit drug-related crimes.
BARKETT, J., concurs.
NOTES
[1] Thereafter, Diamond had two or three telephone conversations with Hunter urging the completion of the transaction, but never met Hunter until the day of the scheduled transaction.
[2] On the day of the scheduled transaction, the supplier took Hunter's daughter with him and watched the transaction from a safe vantage point. When Conklin and Hunter were arrested, he fled and was not apprehended.
[3] The controlling statute in effect in this case provided that the state may move to reduce or suspend the sentence of a defendant who provides "substantial assistance in the identification, arrest, or conviction of any of his accomplices, accessories, coconspirators, or principles." § 893.135(3), Fla. Stat. (1985). The legislature subsequently expanded the statute to benefit defendants who provide "substantial assistance in the identification, arrest, or conviction of any of his accomplices, accessories, coconspirators, or principles or of any other person engaged in trafficking in controlled substances." Ch. 87-243, § 5, Laws of Fla. (codified at § 893.135(4), Fla. Stat. (1987)) (underscore in original). In neither version of the statute does the legislature direct the use of "substantial assistance" to manufacture crime, nor may the legislature do so. See, e.g., State v. Embry, 563 So.2d 147, 149 (Fla. 2d DCA 1990).
[4] In many instances, these are young individuals with no prior criminal record.
[5] As the majority recognizes, we require these persons to turn in "future accomplices." Op. at 320 (emphasis in original).