591 So.2d 1002 (1991)
Carlos RICARDO, Appellant,
v.
STATE of Florida, Appellee.
No. 90-3328.
District Court of Appeal of Florida, Fourth District.
December 18, 1991.
Rehearing Denied January 21, 1992.
*1003 Lawrance H. Schwartz, Miami, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Michelle A. Smith, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Carlos Ricardo appeals his conviction for trafficking in cocaine. His defense was and is entrapment. Appellant Ricardo had no criminal record. He holds a degree in electronics from a university in Bogota, Columbia. When first approached by the confidential informant, he recently had opened his own electronic installation and repair business. He was short on cash and needed money for various purposes.
The confidential informant, Humberto Prieto, better known as Benji, is a convicted drug trafficker. To avoid imprisonment, he entered into an arrangement with law enforcement personnel to conduct reverse sting operations. He receives cash for his participation, the amount of which depends upon the quantity of drugs involved in the particular operation. He has no other source of income. In addition, he is in this country on a tourist visa which does not permit him to work. He is also under threat of deportation, an added incentive to cooperate with the authorities in his role as a confidential informant.
Learning that appellant had repaired a portable telephone which he then was offering for sale, the informant approached him at his place of business. He later would testify that he had no information that appellant was involved in anything illegal. His reason for seeking out appellant was his own personal belief that "85% to 90% of all Colombians are involved in drugs."
At the first meeting the informant feigned interest in the portable phone but suggested the asking price was too high. The informant thereafter made frequent visits to the shop, becoming more friendly with each visit. He learned that appellant needed money because of mounting bills and for an operation which his sister in Columbia needed. The informant refused to buy the portable phone to ease appellant's financial stress but instead loaned him money, the amount of which is unclear from the record.
The informant continued to frequent appellant's place of business and, one week after having made the loan, he insisted on repayment. Appellant offered the portable phone as repayment, which was refused, and then offered repayment in installments. This offer, too, was rejected. The informant then told appellant that the money for the loan actually belonged to "bad guys from Detroit" who wanted their money back.
The day after this incident, the informant was waiting for appellant when he arrived at his place of business. The informant insisted he needed the money then and said, "I can't believe you are Colombian and you don't have any friends that have money or do deals to get money." When appellant asked what kind of deals, the informant said: "We are talking about drugs, all Colombians sell drugs." Appellant responded that if he was selling drugs, he would not have borrowed money from the informant, and he would not be in such a financial bind. The informant explained that his Detroit friends gave him money to buy drugs, but he instead gave it to appellant. Now these people were upset and were threatening him.
The informant thereafter called appellant several times each day, asking about the money and asking appellant to set up a drug deal. The informant also would appear at appellant's business almost every day. Each time, the informant got more persistent, aggravated, and threatening. This continued for several weeks.
Because the informant became more threatening with each visit, appellant decided *1004 to stay away from his business for a few days. He had his brother take care of the business, and his brother told the informant that appellant had been in an accident and was hospitalized. The brother was aware of the intense pressure the informant was putting on appellant to pay back the cash, but he did not know that it included paying back the money by way of a drug deal. Appellant testified that he did not want to tell his family about the problems that the informant was causing because the informant was involved in drugs.
When appellant returned to work, the informant was at the business waiting for him. The informant told appellant that his Detroit friends were threatening him about their money, and because the informant told them he had given their money to appellant, they eventually were going to show up at appellant's business. The informant told appellant that the people from Detroit were dangerous, and that they both should be afraid of them.
The informant warned appellant that he had become part of the problem and that appellant better find someone who could supply drugs to the people from Detroit. Appellant testified that the informant said that his friends would kill people over a money dispute, but the informant denies he said this. The threats and the pressure continued and worsened every day. Eventually, the informant said that his friends from Detroit wanted to talk to appellant about the money and drugs.
Throughout this period, appellant continued to protest to the informant that he did not want to be involved in a drug deal, and more importantly, appellant repeatedly insisted he did not know anyone from whom he could obtain any drugs.
Initially, when the informant began pressuring appellant to produce drugs, he wanted appellant to set up a multi-kilo deal for his Detroit friends. The figure was first 50 kilos, then 35 kilos, then 20 kilos. The informant set up several meetings with appellant and undercover police officers posing as his friends from Detroit. At these meetings, the informant always spoke first with appellant and always in Spanish. He also warned appellant not to say much in English to these people. None of these meetings ever produced drugs.
A few days after the last warning from the informant, a black Mercedes was parked across the street from appellant's business. It was driven by Detective Al Scottie, who was posing as one of the informant's friends from Detroit. The informant and appellant spoke in Spanish in front of Scottie, and Scottie could not understand what either was saying. Afterwards, Scottie showed appellant over $400,000 in cash that he had available to buy drugs. The informant suggested setting up a 50 kilo drug transaction. No drugs materialized from that meeting.
The informant arranged another meeting with Scottie and appellant. They met in a restaurant, and the informant and appellant talked in Spanish before appellant and Scottie talked in English for a few minutes. The informant indicated that he wanted appellant to supply 35 kilos of cocaine. No drugs materialized from that meeting.
The informant and appellant also went to Miami because the informant had some people he thought could supply drugs, and he and appellant planned to tell the Detroit friends that they were making the trip for appellant. No drugs materialized from that trip.
Throughout this entire period, the informant continuously pressured appellant to supply drugs, and the informant persisted in his threats that the Detroit people would harm either appellant or himself.
Appellant testified that he was too frightened to go to the police, and he thought the Detroit people would harm him, his wife or even the informant. He did not know how to get out of a horrible situation, especially when he did not even know anyone to contact for drugs. The informant was able to solve this problem for appellant.
While the informant was at appellant's place of business, he recognized a black car in which appellant was installing a radio. He asked appellant if he knew the person who drove that car, and appellant identified *1005 the car owner as Zulio. (The appellant did not know the man's name actually is Tulio.) The informant said he knew "Zulio," that "Zulio" was a drug dealer and would be able to obtain drugs for appellant. When appellant suggested that the informant ask "Zulio" himself, the informant said it had to be through appellant because the informant had some old debts with "Zulio."
Subsequently, when appellant and "Zulio" talked about drugs, appellant explained to him that he just wanted enough kilos to make a profit of $600 to pay back a person who had been threatening him to pay back borrowed money with a drug deal.
After more than two months from the informant's first contact with appellant, on September 20, 1988, appellant took three kilos from "Zulio" and delivered it to another undercover agent (Detective Tiderington) who was posing as another buyer from Detroit. The delivery took place at a parking lot at a 7-Eleven, and appellant was immediately arrested.
In summary, from mid-July until the end of September when appellant was arrested, the informant was in constant contact with appellant. He phoned him every day, sometimes several times a day. He also went to appellant's business every day. No tape recordings were made of any of the phone calls between appellant and the informant, and no tape recordings were made when the informant spoke with appellant in person. The only tape recordings that were made were one phone call with an undercover agent and the actual drug transaction itself.
The detectives that posed as the buyers in this case were supposed to be supervising the informant and his actions concerning any target. However, the supervising detective (Tiderington) was on vacation during most of this time, and he had no idea that the informant had lent appellant money. Additionally, the detectives had not previously suspected appellant of being involved in any criminal activity; they had not heard his name until the informant called them regarding the drugs. Tiderington testified that he was under the impression that the informant merely went to buy a phone at appellant's business, and once the informant was there, appellant brought up the subject of drugs.
The informant alleged that he had run into an old drug acquaintance of his who was shopping at appellant's business and after they chatted, appellant walked up to the informant and said he could supply him drugs. Appellant disputed this, testifying that this conversation never took place.
Appellant has no prior convictions for any crime. He admitted participating in the actual drug transaction, but asserted that he was pressured, induced, and threatened into participating by the informant.
The leading case on entrapment in Florida is Cruz v. State, 465 So.2d 516 (Fla.), cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985). That Cruz remains viable has recently been acknowledged by the supreme court in State v. Hunter, 586 So.2d 319 (Fla. 1991), and consequently thereafter by this court in Strickland v. State, 588 So.2d 269 (Fla. 4th DCA 1991).
Cruz establishes that there are two aspects of the defense of entrapment: one tested objectively by the court and the other subjectively by the trier of fact.
The threshold test is an objective one focusing on the conduct of the law enforcement personnel involved, and whether that conduct falls below the standard of proper use of governmental power. The trial court addresses this issue by applying a two-prong test and making a determination as a matter of law before the case is presented to the jury.
The first prong of this inquiry is whether the police conduct has as its goal the interruption of a specific ongoing criminal activity. This inquiry thus addresses the problem of law enforcement personnel "making" crime, that is, police seeking to prosecute a criminal where no crime would have been committed but for the police conduct originating the crime.
The second prong is whether law enforcement has utilized means reasonably tailored to apprehend only those already involved in ongoing criminal activity. This *1006 phase of the inquiry addresses the problem of government agents using inappropriate techniques to induce or encourage an individual to engage in conduct constituting a criminal offense where the individual normally would not have engaged in such conduct.
If either prong is violated, then there is entrapment as a matter of law and the entrapped individual is entitled to be discharged. Simply for the sake of completing the Cruz analysis, we point out that where neither prong of the objective test is violated, the defendant then may present his affirmative defense of entrapment to the jury or other trier of fact by alleging that he or she was not predisposed to commit the offense. See § 777.201(2), Fla. Stat. (1989). The test to be applied at this stage is a subjective one.
In our view the facts of this case fall squarely within the objective test of Cruz, and the state fails both prongs of the inquiry. It is clear that appellant was not involved in ongoing criminal activity of any kind at the time he was first contacted by the informant. He had no criminal record and neither the informant nor the law enforcement officers had ever heard appellant's name, much less rumors that he was involved with drugs.
Turning to the second prong, we simply refer back to our recitation of the factual background of this case to illustrate that the informant used grossly inappropriate techniques to coerce appellant into cooperating in "making" a drug deal. We need not reiterate those facts here.
In conclusion we hold that, as a matter of law, appellant, Carlos Ricardo, was entrapped into the drug transaction at issue here and he accordingly is entitled to be discharged. We reverse and remand to accomplish that end.
REVERSED AND REMANDED.
DOWNEY, HERSEY and DELL, JJ., concur.