DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**YUL H. MEDINA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D20-1522

[August 30, 2023]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Tim Bailey, Judge; L.T. Case No. 15-003933CF10A.

William R. Ponall of Ponall Law, Maitland, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Jessenia J. Concepcion, Assistant Attorney General, West Palm Beach, for appellee.

**ON MOTION FOR REHEARING**

LEVINE, J.

We deny appellant's motion for rehearing, withdraw our previously issued opinion, and substitute the following in its place.

Appellant appeals his convictions for trafficking in cocaine and conspiracy to traffic in cocaine. Appellant claims that the trial court erred in not granting his motion to dismiss due to objective entrapment allegedly committed by law enforcement and its agent. We disagree. We find the trial court correctly denied the motion to dismiss and, thus, affirm his convictions. Appellant raises other issues we find to be without merit, and we affirm those issues without further comment.

Appellant was charged with trafficking in cocaine and conspiracy to traffic in cocaine. Appellant moved to dismiss based, in part, on objective entrapment pursuant to article I, section 9 of the Florida Constitution, alleging his acts were induced as a result of egregious law enforcement conduct.

During a hearing on the motion, appellant presented testimony from himself and a friend, who was dating appellant at the time of the offenses. According to appellant, he assisted the confidential informant ("CI") because she was unemployed, had no place to live, and had two children. Appellant and his girlfriend testified that they helped the CI get an apartment, the girlfriend tried to help the CI get a job, and appellant gave the CI money. The girlfriend testified that the CI, who had a boyfriend, called appellant "Mi Amour [sic]" and touched him on the leg.

Appellant testified that he worked at his family business. He denied dealing drugs. Appellant liked the CI, who gave him the impression they could be "life long sole mates [sic]." They were not in a sexual relationship, but were intimate. Appellant did not define what "intimate" meant to him. After not seeing each other for a few weeks, the CI began to continuously ask appellant to purchase kilos of cocaine or assist her in finding someone to purchase it. Appellant repeatedly told her no. All the while, the CI kept acting like they "could have the best relationship ever." At some point, the CI asked appellant to accompany her to a meeting. En route, appellant found out he was meeting with a man who would have a kilo of cocaine. That man turned out to be an undercover officer. The CI asked appellant to appear tough and pretend to know what he was doing. Appellant, allegedly in fear of the undercover officer, began asking people if they were interested in buying cocaine. The CI continued to ask appellant to buy cocaine and to communicate with the undercover officer. The CI was "coaching" him throughout. Appellant and the CI spoke regularly, and many calls were not recorded.

On cross-examination, appellant admitted that an affidavit he signed in 2013 did not say he had dated the CI or had a relationship with her. Appellant filed the affidavit in a prior case, involving the same charges, that the state had nolle prossed. Appellant also testified during cross-examination that the CI promised if he helped her, they would "be together" and have a "happy life together." When asked what he was going to get from the CI for buying a kilo of cocaine, appellant responded that he would be helping her get an apartment.

In opposition to the motion to dismiss, the state presented the testimony of the undercover officer. The undercover officer had worked with the CI before and found her reliable and trustworthy, and she followed the rules and regulations. The CI did not have a physical relationship with appellant. The CI, who was friends with appellant, advised the undercover officer that she had seen appellant use drugs and conduct narcotics transactions at his business. The undercover officer arranged a face-to-face meeting with appellant at a restaurant. During the meeting, appellant

2

and the undercover officer discussed the deals they were going to conduct, and the large quantities of cocaine appellant was willing to purchase. After an hour, the undercover officer and appellant went to the undercover officer's vehicle where the officer presented appellant with a kilo of cocaine as a sample. Appellant inspected the cocaine methodically, making it clear he "had dealt in checking packages of cocaine before in the past and knows exactly what he is doing." The undercover officer had no doubt that appellant was not, in fact, an amateur.

According to the undercover officer, after the meeting, the CI continued to talk with appellant like normal, as instructed by the undercover officer. Ninety percent of their phone calls had nothing to do with cocaine or drug deals. The CI told the undercover officer every time she and appellant had a phone conversation. At no time did the CI meet with appellant by herself without police supervision.

After the first meeting with the undercover officer, appellant contacted the CI to meet with her. The CI, who was wearing a wire, met with appellant, who discussed the future of transactions with the undercover officer. He discussed other individuals he was brokering the deal with and the amount of cocaine he was going to purchase from the undercover officer. No flirtation at all occurred between the CI and appellant.

Appellant and the undercover officer engaged in several phone calls coordinating the drug deal. Appellant initiated phone contact with the undercover officer on several different occasions. Appellant texted the undercover officer to proceed with the purchase of one kilo of cocaine for $25,000. Appellant met with the undercover officer. During the meeting, they discussed future drug transactions and appellant's desire to establish something larger, creating a pipeline from Colombia where appellant was from and using a contact he had in a port. During the conversation, appellant advised that a female, the codefendant, was coming with the money. The codefendant parked her car next to appellant's and placed the money in appellant's vehicle. Appellant then retrieved the money from his vehicle and entered the undercover officer's vehicle. After exchanging the money for the cocaine, the undercover officer gave the takedown signal.

After being *Mirandized*, appellant spontaneously said, "Wow, you're a cop. You're good, man." When walking to the detention facility, appellant kept saying, "I'm f---ed," asked how to get out of this, and asked for help. Appellant advised that he knew other drug dealers and stated he wanted to work other drug dealing operations.

3

The undercover officer further testified that appellant could have backed out numerous times. The undercover officer had no doubt that appellant was ready to conduct the drug transaction and knew exactly what he was doing. According to the undercover officer, the CI did not coach appellant. The CI had no prior criminal arrests and no drug history. The CI was paid based on her participation, regardless of the outcome of the case. During the undercover officer's testimony, the state introduced audio and video recordings of the meetings and telephone conversations between appellant and the CI, and between appellant and the undercover officer, as well as transcripts transcribing the conversations from Spanish.

The trial court denied the motion to dismiss as to objective entrapment, finding no outrageous police conduct. The trial court explained:

> I'm basing it on primarily two things, [the undercover officer's] testimony and [appellant]'s affidavit. I just find it hard to believe that [appellant] is going to provide a sworn statement on his dealings with [the CI] and never mention we were an item. We were involved. She was offering sex.

> I think the way that the Madera [*Madera v. State*, 943 So. 2d 960 (Fla. 4th DCA 2006)], case says, the CI made promises of sex. The CI encouraged a romantic relationship including sex. Well, yeah, I can see where this crosses the line. That is outrageous. That is egregious. I don't see the facts in this case pushing me to that conclusion.

> . . . .

> Well, I got to be persuaded that the cop's agent, [the CI], was trying to offer sex to get this guy to do this deal. I'm not finding that is what I have here. I think that is a little bit of a reach.

The case then proceeded to trial. At trial, the undercover officer testified consistently with his testimony during the motion to dismiss. The state published recordings of the meetings and conversations between appellant and the CI, and between appellant and the undercover officer, with translations from Spanish. The state called appellant's codefendant as a cooperating witness, who testified she sold cocaine to appellant over a hundred times. The codefendant had no doubt appellant was selling cocaine based on the amounts he bought from her. The codefendant and appellant pooled their money to buy the kilo of cocaine, which they were going to sell in smaller quantities.

Appellant testified in his defense that he and the CI had an intimate, but not sexual, relationship. Appellant wanted to take his relationship with the CI to the "next level," and the CI made him believe that a romantic relationship with her was a possibility. On cross-examination, appellant testified for the first time that he had oral sex with the CI. He admitted the CI never promised him sex in exchange for purchasing the kilo of cocaine. Appellant renewed the motion to dismiss after his testimony, and the trial court denied the motion.

The jury found appellant guilty as charged. The trial court sentenced appellant to the statutory minimum mandatory of fifteen years of imprisonment. Appellant appeals.

Appellant claims that law enforcement and its agent, the CI, utilized conduct that violated due process and as such violated article 1, section 9 of the Florida Constitution ("No person shall be deprived of life, liberty or property without due process of law. . . ."). "The review of the denial of a motion to dismiss founded on objective entrapment is de novo." *Dippolito v. State*, 275 So. 3d 653, 658 (Fla. 4th DCA 2019). In this case, appellant claims that the conduct constituted objective entrapment.[1] Objective entrapment is when the "conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *State v. Laing*, 182 So. 3d 812, 816 (Fla. 4th DCA 2016) (alteration omitted) (quoting *Tercero v. State*, 963 So. 2d 878, 883 (Fla. 4th DCA 2007)). When considering whether law enforcement's actions constituted objective entrapment, we "must look to the totality of the circumstances, focusing on whether the government conduct so offends decency or a sense of justice that judicial power may not be exercised to obtain a conviction." *Id.* (citation and internal quotation marks omitted).

Objective entrapment is a "matter of law for the court to decide." *Dippolito*, 275 So. 3d at 659. It is clear that "the ultimate decision of whether the conduct of law enforcement constitutes objective entrapment remains for the court, not a jury, to decide . . . , and the court determined the issue without assistance from the jury. We find no mandatory requirement that the issue be submitted to the jury for resolution." *Id.* at

---

[1] Although appellant raised both subjective and objective entrapment below, on appeal appellant raises only objective entrapment. Therefore, appellant has waived and abandoned any claim of subjective entrapment under section 777.201. *See Polyglycoat Corp. v. Hirsch Distribs., Inc.*, 442 So. 2d 958, 960 (Fla. 4th DCA 1983).

659-60. Further, to the extent the issue on appeal involves the resolution of disputed factual issues, "this court will not reverse a trial court's findings of fact where they are supported by competent, substantial evidence." *State v. Taylor*, 784 So. 2d 1164, 1166 (Fla. 2d DCA 2001).

Only limited types of governmental conduct have resulted in a finding of objective entrapment. *See State v. Williams*, 623 So. 2d 462 (Fla. 1993) (finding objective entrapment where police manufactured and initiated sale of crack cocaine); *State v. Glosson*, 462 So. 2d 1082 (Fla. 1985) (finding contingency fee arrangement for informant's testimony violated due process); *State v. Hunter*, 586 So. 2d 319 (Fla. 1991) (finding objective entrapment where informant's contract with police required him to obtain four kilograms of cocaine to reduce his sentence); *Dial v. State*, 799 So. 2d 407, 410 (Fla. 4th DCA 2001) (finding objective entrapment where informant "target[ed] an innocent person [working] under her supervision and exploit[ed] her weaknesses without any efforts from law enforcement to avoid entrapment or monitor the informant's activities").

In this case, appellant relies on three different reasons to justify his claim of objective entrapment. Appellant claims that the police failed to monitor the CI, objects that payment to the CI was contingent on the work the CI did and the results law enforcement obtained as a result of her assistance, and finally alleges the CI used sex to induce him to commit the crimes of trafficking and conspiracy.

Appellant's claim that law enforcement failed to monitor the CI is meritless. During the investigation, law enforcement told the CI to continue her friendship with appellant as normal so that appellant would not be alerted to any change in behavior. This was done, at the behest of law enforcement, for the safety of the CI. The CI reported all of her calls to the undercover officer, who testified in turn that "90%" of the phone calls had nothing to do with the cocaine trafficking. The CI complied with the undercover officer's instruction not to meet with appellant without law enforcement supervision. The CI was always wired and monitored by law enforcement when she met with appellant. Therefore, the instant case is unlike *Nadeau v. State*, 683 So. 2d 504, 506 (Fla. 4th DCA 1995), on which appellant relies because in that case, for example, the agents and officers did not actively monitor the informant's repeated contacts with the defendant.[2]

---

[2] Further, *Nadeau* included the following additional factors, none of which were present in the instant case: the informant was working off a substantial assistance agreement with the police, the informant threatened the defendant and his family if he did not sell drugs and had previously pointed a shotgun at

It is important to note that the failure to monitor a CI, in and of itself, would not necessarily support a dismissal for objective entrapment.

> Failure to supervise a CI will not support dismissal unless the lack of supervision results in unscrupulous conduct by the informant. Without more, this failure does not rise to the level of a due process violation. The mere fact that the [CI] made repeated phone calls to appellant without the police monitoring them is insufficient to show entrapment.

*Dippolito*, 275 So. 3d at 658 (citations omitted). Thus, the fact that some calls were not reported in the present case, but still reported to law enforcement, does not constitute objective entrapment.

Appellant also complains about the method of payment to the CI. The undercover officer testified at length as to how the CI was paid in this case. The CI was paid based solely on her participation in the case. The CI's payment was not contingent on the amount of money recovered by law enforcement or the amount of drugs involved, nor was payment tied to appellant's conviction or arrest. The CI did not know what she was going to make. The undercover officer would recommend a payment amount based on the CI's ability to follow instructions, performance, information provided, and length of service as a CI. The chief of police would then make the ultimate decision as to the amount of payment.

It is clear in this case that the payment was not contingent on any result. Nor was it contingent on the substance of the testimony or the amount of narcotics involved in the transaction. In *Glosson*, for example, the Florida Supreme Court found that a confidential informant's fee being contingent on trial testimony or contingent on getting a conviction would violate constitutional principles of due process. 462 So. 2d 1082. Being a paid informant is not prohibited per se or in any way violative of constitutional parameters. Only if the payment is structured so that payment is contingent on the amount of drugs, the type of testimony, or the result at trial can due process concerns result. None of these unlawful contingencies exist in the present case.

Finally, appellant claims that the CI used appeals to his "emotions"

---

the defendant, the undercover detective offered the cocaine at a discounted price to induce the defendant's participation, and the undercover detective agreed to "front" the drugs due to the defendant's lack of funds. *Id.* at 505.

with a "promise of sex" to induce his criminal conduct. Appellant claims that the lure of sex by the CI constituted objective entrapment.

It must be noted that over the course of this case, appellant's claims characterizing the actions of the CI have changed. In the initial 2013 affidavit, appellant did not claim he had an intimate relationship with the CI, nor did he mention any sexual inducement. During a hearing on the motion to dismiss, appellant then claimed he had an intimate, but not sexual, relationship with the CI. During the trial, on direct testimony, appellant stated he had an intimate, but not sexual, relationship with the CI. Appellant testified he wanted to take his relationship to the next level, and he believed a romantic relationship was a possibility.

Only on cross-examination, during the trial, did appellant testify for the first time that he had oral sex with the CI. At no time did appellant testify that the CI promised him sex in the future, or that any sex was tied to appellant's participation in the drug trafficking offense. Even the allegations of sexual contact brought up for the first time in cross-examination were never tied to appellant's participation in the drug trafficking. In fact, during cross-examination, when asked what appellant was going to get from the CI for buying the kilo of cocaine, appellant responded that he would be helping the CI get an apartment. So even in cross-examination, appellant never linked sex to his participation in the crime.

This case is unlike *Madera*, where our court found objective entrapment where "[t]he CI made promises of an intimate relationship, to include sexual relations, if the defendant would assist her in obtaining drugs." 943 So. 2d at 962. In the present case, the CI did not make promises of sex if appellant would purchase the kilo of cocaine. Appellant's own testimony stated that he believed that he and the CI could be "life long sole mates [sic]," but he never tied this subjective feeling to any of the CI's statements. In fact, except for his testimony on cross-examination, appellant had always stated that he never had a sexual relationship with the CI. Finally, there was never any testimony that the CI promised him a sexual relationship in exchange for his participation in the drug trafficking.

Significantly, the trial court denied the motion to dismiss based in part on objective entrapment due to the fact that the initial affidavit from appellant in 2013 did not contain any allegation of sexual inducement by the CI. The trial court made a credibility finding when stating: "I just find it hard to believe that [appellant] is going to provide a sworn statement on his dealings with [the CI] and never mention we were an item. We were

involved. She was offering sex." It is within the trial court's domain to resolve disputed issues of fact.

Based on the evolving and changing positions of appellant as to his relationship with the CI, the trial court could disbelieve appellant's testimony, as a whole or in part, and determine that the factual basis alleged to establish objective entrapment did not occur as alleged. *See Dippolito*, 275 So. 3d at 659 ("Even if there were disputed issues of fact, the trial court resolved those issues on the motion to dismiss filed by the appellant and determined that law enforcement's conduct was not so outrageous as to offend due process principles.").

Objective entrapment is implicated only when the conduct of the state or its agents is so wrong that society's sense of decency is offended. This remedy is limited to those rare occasions and circumstances where the conduct "so offends" that the court will be required to act to prevent the reoccurrence of such behavior from the state against its citizens. The facts of this case do not violate these parameters, or the due process requirements of the Florida Constitution, and as such, we affirm.

*Affirmed.*

DAMOORGIAN and KUNTZ, JJ., concur.